JOHN NICHOLS *against* ALLYN PALMER, executor of NOYES PALMER, deceased:

### IN ERROR.

THIS was an action of debt, brought against the defendant, as executor of the last will and testament of *Noyes Palmer*, deceased, on a bond executed by the deceased, in his life time, to the plaintiff. A condition was annexed to the bond, which was recited at large in the declaration, and was of the following tenor, *viz.* " That whereas, some un-

*A.* and *B.* being husband and wife, mutually agreed to live in a state of complete separation; whereupon, it was agreed, in writing, between *A.* and *C.*, that *A.* should deliver over to *C.*, as trustee of *B.*, all the estate acquired by *A.* in consequence of his intermarriage with *B.*; and that *C.* should provide for the maintenance of *B.* during her natural life, pay all her debts, &c. Held, that an action on such contract, in favour of *A.* against *C.* was sustainable.

Where the pleadings terminated in an issue in fact, which was closed to the court; and the court, without answering the issue, adjudged the declaration to be insufficient; it was held, that such judgment was irregular, and erroneous.

happy differences have arisen, and now exist between the said *John Nichols* and *Sarah Nichols,* his wife; and they the said *John* and *Sarah* having finally concluded and determined to separate, to live ever hereafter, in a complete state of separation; and that he the said *John Nichols,* should deliver up to the said *Noyes Palmer,* as trustee to the said *Sarah,* all the property that the said *Sarah* brought with her at the time of her intermarriage with him the said *John, viz.* her household furniture that is now in being, and all the monies which the said *John Nichols* hath received as the property of said *Sarah,* since their marriage, excepting 100 dollars, which the said *Nichols* hath paid out and expended in certain suits at law, and for debts due from them the said *John Nichols,* on account of his intermarriage with her the said *Sarah;* said property to be by him the said *Noyes Palmer,* held in trust, as trustee to the said *Sarah,* and for her separate use and maintenance, forever hereafter to use and improve the same, whether real or personal; and the said *Sarah* to have the whole benefit and enjoyment of her said property, to all intents and purposes, as a *feme sole,* and to dispose thereof at pleasure. And the said *Noyes Palmer,* as trustee to said *Sarah,* hath agreed, and doth hereby agree with the said *John Nichols,* forever hereafter, to support and maintain the said *Sarah,* and to pay all debts now due or owing from the said *John Nichols* and *Sarah,* on account of any debt, by the said *Sarah* contracted previous to their marriage, or for any debts, costs or charges, on account of law-suits now commenced, or that may be commenced against the said *John,* on the said *Sarah's* account," &c. The condition also contained a stipulation, that the obligor should save the plaintiff harmless, and acquit him and his estate, from all claims of his wife for dower, and from all claims for debts which she might thereafter contract. The breach of the condition alleged was, that the plaintiff had not been saved harmless, but had been compelled to pay the sum of 150 dollars for fees, charges and expences in certain law-suits, prosecuted against him, on account of his wife.

The defendant pleaded in bar, that *Noyes Palmer* died on

or about the 15th day of *October*, 1807, having made and published his last will and testament, and appointed his wife, *Dorothy Palmer*, and the defendant, his executors ; that the will, on the 3d day of *November*, 1807, was duly proved, and that the defendant accepted the trust of executing the same ; that the court of probate passed an order, that notice should be given to the creditors of the testator's estate, to exhibit their claims to the executor, within six months from the 3d day of *November*, 1807 ; that due notice of such order was given ; and that immediately afterwards, the defendant caused an inventory of all the goods, chattels, credits and estate of the testator, to be made and exhibited to the court of probate, who accepted the same ; and that no further estate of the testator had been discovered. The plea then contained an averment, that the plaintiff's whole cause of action accrued prior to the expiration of the time limited by the court of probate for the exhibition of claims against the estate of the testator ; and that the time of such limitation expired long before the bringing of the plaintiff's action ; that the plaintiff did not, within the time of such limitation, exhibit to the defendant the bond on which, &c. nor any claim whatever, against the estate of the testator.

To which plea, the plaintiff replied, that the bond on which the suit was brought, was executed to the plaintiff, to indemnify him, among other things, against the costs and charges of divers suits at law, &c. concerning his wife ; which were for a long time pending, and undetermined ; that the condition of the bond was not broken within the time limited for the exhibition of claims against the estate of the testator, and that the plaintiff's claim was under such circumstances, that its amount could not be ascertained and proved within the time of such limitation, but that after the period of the limitation had expired, to wit, on or about the 20th day of *November*, 1809, the plaintiff was damnified, by being compelled to pay the sum of 300 dollars for counsellor's fees, and other expences concerning the suits mentioned in the condition of the bond, and for taxes assessed on the estate of his wife. It was also averred in the replication,

VOL. V.          G

that the defendant had full knowledge of the plaintiff's claim upon the bond, and that he had recognized and admitted the same, both before and after the expiration of the time for the exhibition of claims; and that the defendant had in his hands, assets more than sufficient to satisfy the plaintiff's demand.

The defendant, in his rejoinder, averred, that all the suits mentioned and referred to in the condition of the bond, had been commenced, prosecuted and terminated, prior to the expiration of the time limited for the exhibition of claims against the estate of the testator; and that prior to that time, the debts therein mentioned, had been put in suit, and final judgments rendered thereon against the plaintiff, and that such judgments were in full effect, and unsatisfied, prior to, and at the expiration of such limitation, &c. The fact alleged in the replication, that the defendant had full knowledge of the plaintiff's claim, and had recognized and admitted the same, was traversed. The pleadings, thus ending in an issue in fact, were closed to the court.

The Superior Court adjudged the declaration to be insufficient, and rendered judgment for the defendant. To reverse that judgment, the present writ of error was brought.

*Daggett*, for the plaintiff in error, contended,

1. That the declaration is sufficient.

2. That nothing is disclosed by the pleadings, which shews that the plaintiff is not entitled to recover.

3. That by the form of the judgment, no notice is taken of the issue. To illustrate the last point, he cited *Sanford* v. *Sanford*, 2 *Day*, 559.

*Goddard*, for the defendant in error, cited *Goodwin* v. *Goodwin*, 4 *Day*, 343. *Marshall* v. *Rutton*, 8 *Term Rep.* 545. *Dibble* v. *Hutton*, 1 *Day*, 221.

BALDWIN, J. The plaintiff in error, contends for the reversal of the judgment, on the following grounds, *viz.*

1. That the declaration is sufficient.

2. That the pleadings do not disclose any facts, which shew that the plaintiff cannot recover.

3. That no answer is given to the issue joined by the parties.

As the second point was admitted in the argument, and the third is a question of practice merely ; the sufficiency of the declaration, demands our particular attention.

It is objected to the declaration, that it exhibits a contract, depending for its basis, on an agreement between husband and wife to part and live separate. It is contended, that such an agreement cannot be recognized as of any validity, because sound principles of policy forbid it, as *contra bonos mores* ; and that of course, all contracts engrafted upon such a stock, must also be void. I admit, that contracts between husband and wife simply, cannot be enforced ; yet when such agreements are executed by the intervention of a trustee, I contend, that the contract with the trustee, is not necessarily void.

The doctrine of separate maintenance, by the aid of a trustee, is found in the earliest records of *English* jurisprudence. Such contracts have, for ages, been protected and enforced in their courts of chancery : and when collaterally brought to view in courts of law, have been recognized as the basis of legal adjudications. So far have been the courts in *England* from questioning the efficacy of such agreements to support a contract for maintenance, that a very different question has agitated them in modern times, *viz.* the capacity of the wife during such separation. When we thus find a practice of this sort, long used, and universally recognized in the courts of that country, from whence we derive the principles of our common law, we ought to be clearly satisfied, that it is opposed to principle, before we reject it.

This question has not, till lately, become the subject of judicial decision in this state. Cases of the kind have, indeed, occurred, and passed in silence ; but are rare, because the reasons which would otherwise induce a separation, generally, here lead to a dissolution of the marriage, by divorce. And the legal provision in our law for divorces, is

June, 1811.

NICHOLS
v.
PALMER.

used as an argument against the admission of separation, by agreement, for any cause. The policy of our laws has not, indeed, considered the marriage relation indissoluble. Perceiving that, from the vices and imperfections of human nature, some of these connexions, instead of a blessing, become the source of wretchedness, to one or both the parties; it admits, that more than one cause may exist, which will evince a breach of the contract, and render even a dissolution of the marriage proper. The legislature have also, in a few extraordinary cases, without dissolving the marriage, enforced a separation;—yet I cannot admit, that our laws have, in these ways, provided for all cases in which a separation may be proper, nor that it is always advisable to resort to them. Cases may also exist, and sometimes do, where the wretchedness and misery of the connexion, arise from brutal cruelty, abuse and danger, and from other sources, not acknowledged by law, as cause for divorce, or as ground for legislative interference. In such instances, a compulsory cohabition would prolong, and probably increase the wretchedness of an innocent victim, and of a miserable family; and no one end of the marriage relation could thereby be attained. What harm, then, is done to morality, or what sound principle of policy is impugned, by permitting the parties, on good cause, to separate by agreement, and thus save the painful task of exposing the follies or the vices of partners, to obtain a compulsory separation, or the disgrace and misery of themselves and families, by fruitless attempts to live together in harmony. I cannot perceive that it would be morally wrong, that the innocent party should, in such case, separate, and that the guilty partner should agree to it; nor that sound policy would withhold the sanction of law to a provision for maintenance, through the intervention of a trustee, founded on the basis of such separation.—There is very little danger that cases of this sort, will arise from whim or caprice; nor are they likely to become frequent, under a government, where divorces may be obtained for most of the causes of separation in other countries.

I admit, however, that there may be cases of separation

by agreement, attended with such circumstances, and resting on such foul principles, that good policy will not support them. When a case is claimed to be of that description, it is incumbent on those who claim it so, to shew it. The cause may be sufficient, and yet of a nature, improper to be stated in the contract. No improper ground appears, or is pretended to exist, in this case. It is, therefore, much stronger, than that of *Goodwin* v. *Goodwin*, 4 *Day*, 343. on which the court, at the last term, were divided.

In my view of this case, there is no necessity of considering the third ground of error ; yet, as the question is of some importance in practice, and the different branches of the Superior Court have adopted different rules, it is advisable to decide it, for the sake of uniformity.

The power of the court to try issues in fact, is of recent date. By the statute giving the power, the court, when the parties so agree, are substituted in lieu of the jury, to try such issues : and although the court, without a special motion for that purpose, have ultimately the power of deciding, and are, indeed, bound to decide, on the sufficiency of the declaration, and for the sufficiency in that, and for other defects in the record, to arrest the judgment, which would otherwise follow their finding ; yet, I apprehend, it would introduce much confusion, uncertainty and irregularity in the proceedings, if the practice in question were sanctioned. The parties have submitted a particular question of fact. This the court were bound to answer, as much as a jury. Whether the issue is material, or whether the declaration is sufficient to support a judgment, is a subsequent question, as distinct from the fact in issue, as though that were still tried by a jury. In this way, that desirable distinction, which ought always to be made, between matters of fact, and questions of law, is preserved. The court, in trials to the jury, cannot stop the proceedings, on discovering cause of arrest ; nor can they discharge the jury from finding the fact. In the case of *Sanford* v. *Sanford*, 2 *Day*, 559. judgment was reversed, because the Superior Court directed the jury to find for the defendant, on the ground that the decla-

ration was insufficient; and yet the Court of Errors were also of opinion, that the declaration was insufficient, and of course, that judgment ought to have been arrested, had the jury found the issue in favour of the plaintiff.

If it shall be established, that the court must find the issue before they arrest the judgment, we cannot presume, as has been suggested, that they will not do their duty :—or that they will decide with prejudice, because they may think the finding of no avail; for if their judgment on the declaration should be reversed, their finding will be important. It may be, on the principle of *Gleason* v. *Chester*, 1 *Day*, 27. 152. the basis of an eventual judgment.

I am, therefore, of opinion there is error on both points; and that judgment ought to be reversed.

MITCHELL, CH. J. concurred in this opinion.

SMITH, J. This bond is opposed to no positive law, nor is it repugnant to any principle of morality : Before we declare it void, therefore, we ought to discover some imperious considerations resulting from principles of policy. I have not been able to discover any such considerations. It is the first dictate of sound policy, to allow of perfect liberty in our citizens, to make such contracts as their necessities or convenience may require ; provided the public interest is not essentially endangered : and it is not enough that ingenious and speculative men can foresee a possible injury to the public ; but to destroy a solemn contract, entered into by the parties, on a valuable consideration, made for their own convenience, of which they are at all times the best judges, and which is neither opposed to positive law, nor principles of morality, the public injury should be immediate, palpable and manifest. There is great danger of ensnaring the public, by adopting new principles, and applying them to contracts already made. Every person is supposed to know, when he is contracting to violate a positive law, or any principles of morality ; but a person cannot be supposed to foresee all the remote consequences of his acts, in a refined political view.

The bond in question, merely binds the defendant to pay certain debts for the plaintiff, and to support the plaintiff's wife; and the declaration states, by way of recital, that the defendant has failed to pay some of the debts which he stipulated to pay. If we were to stop here, I think no one would say, that the plaintiff might not safely contract with the defendant to pay his debts or support his wife; but it appears also, by way of recital, that the plaintiff and his wife, owing to some unhappy differences, had agreed, ever after, to live separate; and that certain property was delivered over to the defendant, which he agreed to hold as trustee, for the benefit of the wife, and to pay certain of her debts contracted before marriage; and that the bond was really given to secure a faithful performance of his trust.

The question then, is, whether this agreement between husband and wife, to live separate, destroys the bond?

It will not be insisted, I presume, that a man cannot live separate from his wife, for months or years, where their mutual necessities require it; and that, during such period, he may contract with a friend for the support of his wife, will not be denied. There is not even a violation of civil rights in the case, since the husband is still performing the duties enjoined by the marriage covenant, by supporting his wife in such way as suits their mutual convenience. And if they may live separate for one year, or ten years, under particular circumstances, why not for life—where circumstances require it? Indeed, people of sixty or seventy years old, separating to live with their particular friends the remainder of their lives, do not, upon ordinary calculation, separate but a short period; and people in middle life cannot calculate on but a few years for their mutual lives.

Instances frequently occur, where, to compel the parties to live together, would be of no use to the public, and very injurious to those concerned. They may be old persons, each with children of their own, with whom they may be desirous to live. The husband may be in habits of intoxication, which renders miserable and wretched an amiable and virtuous wife. One of the parties may discover bodily defects

June, 1811.

NICHOLS
v.
PALMER.

in the other, after marriage ; or, other grounds of divorce may occur, which the injured party may be unwilling to disclose : perhaps, they have children who are to be disgraced, and whose feelings are to be wounded, by a public disclosure of a crime in one of their parents.

In all these cases, the husband may have property, and his sense of justice induce him to make provision for the support of his wife : And I can really see no reason why he should not be allowed to do what justice dictates, and what the comfort and happiness of an injured party requires. If any contract for total separation can be supported, the present may ; and in adjudging this valid, it is not necessarily implied, that all agreements between husband and wife for separate maintenance, are so : there may be circumstances which would render them otherwise.

Contracts between the husband and some third person, for the separate maintenance of the wife, have the uniform sanction of the courts, in *England*, from the earliest period of their jurisprudence, and is a part of the ancient common law.

In this country, it is believed, that our ancestors have been in the habit of making similar arrangements, from the first settlement of the country ; and many exist at this time, in various parts of the state, which have been made in pursuance of this usage. Such being the common law of *England*, at the time our ancestors emigrated from that country, and such having been the usage in this country ever since, it ought now to be binding on our courts, as the common law of the land. If any evil is apprehended in suffering such arrangements to be made in future, the legislature may interpose, and make such regulations as they think proper, which, by a regular promulgation of the law, will apprise our citizens of what they are to expect. I am so far, however, from believing, that legislative interposition will be necessary on this subject, that I confidently believe, no evil has yet been experienced, and that none is to be apprehended.

While I would admit the common law of *England* in its full extent, so far as it regards the power of the husband to contract with a third person for the separate maintenance of

the wife, I would by no means give it an extension, which should, in any degree, impair another well known principle of the common law, that the legal existence of the wife is merged in that of her husband, or suspended during coverture, so that both form but one person in law. It is here we find in the proceedings of the *English* courts of chancery, a departure from ancient principles, which has, by degrees, destroyed a feature in the marriage connexion, highly important to be preserved. It is owing to this, that a state of things has been gradually introduced into that country, and within a century past, has extended itself through all classes of the community, which is highly to be deprecated any where, and to which, I would, by no means, give the least countenance. The correct middle course is, therefore, obviously presented to our view; and this is the course pointed out by the ancient common law; that while the husband can form a valid, binding contract with any other person, for the support and maintenance of his wife, she, on the other hand, can have no separate existence, either in law or chancery.

It follows from these principles, that the wife will have no separate interest in the property put into the hands of a trustee for her support, and that she can have no remedy in a court of chancery to call the trustee to account; but if the trustee is guilty of a breach of trust, he must be liable to the husband for a violation of his contract, and to him, or his representatives, only. It will follow also, that the wife may return to her husband whenever she chooses, and he will be as much obliged to afford her protection and support, as though no such agreement had been made; and her right of dower, in case she survives her husband, will remain altogether unimpaired.

If these arrangements for separate maintenance, can be kept within this boundary, they will not become more common than what is absolutely necessary, and probably not more so than they have been in this state, from the first settlement of the country.

It is the giving a wife separate property to manage, independent of her husband, which induces so many people of

VOL. V.                    H

fortune in *England* to live separately, and which introduces a state of things so much to be regretted in that country. And it was this principle which the court intended to resist, by their decisions in the cases of *Dibble* v. *Hutton*, 1 *Day's Rep.* 221. and *Fitch* v. *Brainard*, 2 *Day's Rep.* 163. determined some years since. It was the new principle of the wife's separate property, separate rights, and her independent legal existence, which the court thought not proper to incorporate into our system. It was this, which the court say had grown up in *England* since the emigration of our ancestors, and of course, they could not have brought it with them to this country. It was this, which the court say " was at once the cause and effect of licentiousness ;" but in the decision of both these cases, the court go expressly on the ground of adopting the ancient common law, and only reject the modern refinements upon the marriage institution.

REEVE, J. and TRUMBULL, J. concurred in the foregoing opinions.

SWIFT, J. This is the first case, in which the question, whether a contract for a separate maintenance, by husband and wife, is valid—has come before this court, and ought to be decided on general principles. There was another point in the case of *Goodwin* v. *Goodwin*, 4 *Day's Rep.* 343. on which a part of the court grounded their opinion, so that this question was not then settled.

Contracts of this description have been long sanctioned in *England*, owing, probably, to the circumstance that absolute divorces are not permitted for causes arising subsequent to the marriage. But in this state, such liberal provision is made by law, for divorces, that necessity does not require, and policy does not admit, a separation by private agreement.

Although the marriage contract, is, in our law, considered to be of a civil nature only, yet there is a certain sanctity attached to it, which forbids us to degrade it to a level with ordinary contracts, and to permit the parties to dissolve it *ad libitum*. As the legislature has made provision for divorces,

in cases which they deemed reasonable and proper, it appears to me to be unnecessary for courts of law to interpose. For although cases may occur, not within the provision of the law, such as discordance of temper and character, where the marriage state may be extremely wretched; yet, it is unquestionably better that the parties should endure the misfortune of an improvident connexion, than to loosen the bonds of society by opening too wide a door for relief.

It appears to me, that there are strong objections to contracts of this nature. Where the law requires, that the dissolution of the marriage contract, must be effected by the intervention of a court of justice, or the legislature, the proceedings will not only give the parties that time for deliberation, which will prevent hasty separations; but will lead to the investigation of facts, in that public manner, which they would be unwilling to submit to, unless there were real grounds for a separation. At the same time, courts would have the power of preventing one party from taking that undue advantage of the other, which would often be taken, where the separation was made by private agreement. But if a separation can be made by the contract of the parties, without any public investigation of the grounds of it, what will be the consequence? Instances will frequently occur, where married persons, in the heat of some petty quarrel, or in the coldness of temporary disgust, will agree to live separate, when, if they only had the time for consideration, necessary for an application to a court of justice, for a divorce, they would get over the misunderstanding, and be able to live together in tolerable harmony and happiness. How often would private separations take place for such frivolous causes as they would blush to avow in a court of justice? How much would the disposition for mutual forbearance be lessened, when they knew they could separate at pleasure?

Although good policy does not require the marriage contract to be indissoluble, yet, it requires that the terms by which separations can be effected, should be so strict as not to encourage them on slight grounds. I think it to be bad

policy, to permit any members of the community to place themselves in the situation of married persons, living separately, on private agreements. Such persons have not only renounced all connexion with each other, but have precluded themselves from forming the marriage connexion with any other. Thus circumstanced, they are divested of the most powerful motive to good conduct, the hope of forming an honourable connexion with the other sex. They are under the strongest temptation to the practice of vice, as the only method of indulging their passions. That this will lead to corruption of manners, is too evident to require proof or illustration.

It is true, it has been said, that such separation should be admitted only in cases of the most urgent necessity, and for the strongest reasons ; but no line of discrimination can be drawn. This decision proclaims to all who are married, that they have the right to separate by mutual consent, as whim, fancy or passions may dictate. This is to foster that unfortunate propensity to change, which is productive of misery in society, beyond the power of description. This will heighten the advantage which one sex can take of the other. A man who has formed an attachment for another woman, and wishes to be rid of his wife, can, without difficulty, make her situation so miserable, that she will be induced to consent to a separation. While she is doomed to a state worse than perpetual widowhood, he may console himself for the loss of a wife he hates, in the arms of a mistress he loves; and such is the depraved state of manners, while he will be able to retain his rank in the fashionable world, the unhappy wife, if she attempts to indemnify herself in the same manner, will become an object of reproach and insult, and be banished from all decent and respectable society.

I regret, that a principle so unfavourable to the morals and manners of the community, is about to be incorporated into the system of our jurisprudence : And I think the judgment of the Superior Court was correct, and that the declaration was insufficient.

June, 1811.

NICHOLS
*v.*
PALMER.

INGERSOLL, J. In this case, my opinion is, that the form of the judgment is not right. But upon no other ground, could I wish to reverse it.

The contract set up in the declaration, is, as I think, an illegal one, being *contra bonos mores.* The marriage contract cannot, *ad libitum,* be dissolved by the parties. Nay, I presume, in every case, application must be made to a forum, appointed by law for the purpose, to effect a dissolution. It follows, then, of course, that every agreement, the consideration of which is the dissolution, or the intended dissolution, of the marriage contract, is void, and cannot be enforced in a court of justice. What, then, is a dissolution of it? I should suppose, an agreement to live separately, and to perform none of the duties to each other, which they solemnly promised to perform when the marriage took place, is a dissolution of the contract, so far as the parties can dissolve it. If this be a just position, every agreement to carry into effect such separation, must be against law. The agreement in question, being made to carry into effect such separation, by fair logical deduction, is against law, and void. I say nothing about the doctrine of *separate maintenance,* in *Great-Britain* ; I take it, that doctrine is exploded in this state.

But suppose, for argument's sake, a case may be stated, which would be a good and legal cause for the husband and wife to separate from each other, and to live so during their lives ; and that a contract founded on such separation would be good. I lay it down as a principle, that in every such case, the consideration of the contract, must appear in the contract itself. It is not a valid contract, unless it so appear. The general rule of law being, that such contracts are void—if there be one out of the general rule, it must appear by the record to be such a contract. It is a general principle, that a promissory note, appearing on the face of it, to be for *value received,* is, *prima facie,* good against the promissor. So, also, a bond, under hand and seal, is, in like manner good, against the obligor. But both these instruments may be avoided, on the ground of insanity, infancy, duress, illegality, as well as upon various other grounds : But it is incumbent on the

defendant to shew these grounds, in order to avoid the instrument. It is in vain to say, that, in order to make the instrument good, the person, who executes it, must be of sound mind, of full age, under no duress, and that it is on good consideration. It is true, that these circumstances are essentially requisite to the validity of such an instrument; but they are supposed to have taken place, unless the contrary be shewn by the defendant.

Let us, then, apply these principles to the case under consideration. I think it must be conceded, that generally speaking, it is not competent for man and wife to separate, from whim or fancy, or because they are not quite so well agreed, and do not live so happily together as they themselves contemplated, or as their friends could wish. This point being conceded, it follows, that all contracts for a separate maintenance, grounded on such considerations, are void. I think, further, it will be conceded, that it must be a very extraordinary case to justify the separation. If so, the consideration of the contract ought to appear on the face of the contract itself, as well as in the declaration: For this plain reason, such contracts are, *prima facie*, bad, as much as a note, purporting to be for valuable consideration, is, *prima facie*, good.

Again, if in any written agreement, instead of being stated, that it was executed for a valuable consideration, generally, the real consideration be stated, and if it appears to be illegal, such agreement will not bind the party executing it. What, then, is the consideration in the present case, or the condition of the bond given by *Noyes Palmer* to the plaintiff? The condition is expressed thus: "the condition of this obligation is such, that whereas, some unhappy differences have arisen, and now exist, between the said *John Nichols* and *Sarah Nichols*, his wife; and they the said *John* and *Sarah* having finally concluded and determined to separate, to live ever hereafter, in a complete state of separation," &c. It seems, then, that *unhappy differences*, are the only grounds of separation; and a contract, grounded on this separation, for *unhappy differences*, is to be carried into effect. If this be a good cause for a separation of man and wife, I know

not what marriage is stable. Differences there may be, and often are, between the best of husbands and the best of wives, and these sometimes unhappy. But it may be said, that these *differences* might have been of an enormous kind, and if every thing behind the curtain was made to appear, there could be no question but that the separation was proper, and of course, that the bond is good. Let the curtain, then, be taken away, that the court may see the whole of the conduct which caused the separation. The court can make no inferences; they are bound by what appears on the record, and can look no farther. It is well known, that the General Assembly of this state, have often granted divorces, for conduct that has been enormously cruel. Is not that conduct specified in the petition? Suppose a petition were brought before that body, praying for a divorce, on the ground of *unhappy differences,* and nothing else; would such a petition stand against a demurrer, a moment? I think not. I trust it is not a novel principle, that a bond, given in this state, for a separate maintenance of a wife, is, *prima facie,* bad. Our books tell us, that bonds in restraint of marriage, generally, are bad; that bonds in restraint of trade, generally, are also bad. To make a bond of the latter kind good, the restraint must not be general, but particular, confining the restraint to a particular place. It must also be on good consideration, moving from the obligee to the obligor. So it is laid down by *Strange,* in arguing the case of *Chesman* & ux. v. *Nainby,* 2 *Stra.* 739 to 744. and not denied by the court. In page 741. he says, referring to what the court said in the case of *Mitchell* v. *Reynolds,* determined *Hilary Term,* 11 *Ann,* " And it was resolved by the court, on solemn argument, that in all cases in restraint of trade, where nothing more appears, the law presumes it to be bad: And that in order to make it good, it must appear to be confined to a particular place, and upon a consideration moving from the obligee to the obligor; and that all general restraints are void, whether by bond, covenant or promise, and though with a consideration; and so are also, particular restraints, where there is

no consideration." (And to support this, were cited *Broad* v. *Jollyfe*, Cro. Jac. 596. 2 *Bulstr.* 136. *Colgate* v. *Bacheler*, *Cro. Eliz.* 872.) The court also, in page 744. in giving their opinion, say, speaking of the consideration in that case, "there is a plain and reasonable consideration for so much as the breach extends to," confirming the doctrine, that in a particular restraint, there must be a reasonable consideration. I trust, also, it is not a novel principle, that the court cannot go out of the record to look for a consideration, over and above what is specified in it, to be the consideration. To illustrate this point, I would refer to the case of *Lowe* v. *Peers*, 4 *Burr.* 2225. This was an action on a marriage contract, of the following tenor : " I do hereby promise Mrs. *Catharine Lowe*, that I will not marry with any person besides herself ; if I do, I agree to pay to the said *Catharine Lowe*, 1,000l. within three months next after I shall marry any body else." There was a verdict for the plaintiff in this case, and a motion in arrest of judgment, on the ground that the declaration was insufficient. And after hearing counsel on this motion, the judges, *viz.* Lord *Mansfield*, *Yates*, *Aston* and *Willes*, gave their opinion, that judgment should be arrested. It was argued in favour of the declaration, that the whole transaction amounted to a mutual promise to marry each other (which no doubt would have been good,) "that the plaintiff's acceptance of the deed was sufficient evidence of mutual promises ; that there was, therefore, a consideration for the defendant's promise, and that the promise was by deed, and that a deed carries its own consideration ; that it was not an engagement in restraint of marriage generally, but a restraint only from any body else but each other." Lord *Mansfield*, in giving his opinion, observed as follows : " But here is not the least ground to say, that this man has agreed to marry this woman ; much less, does any thing appear, of her engaging to marry him. There is a great difference between promising to marry a particular person, and promising not to marry any one else. There is no colour for either of these constructions that have been offered by the plaintiff's counsel." Mr. Justice

*Yates*, among other observations, said, " This agreement is in restraint of marriage ; it was not a covenant to marry the plaintiff, but not to marry any one else : and yet she was under no obligation to marry him." He added further, " As to mutuality of contract, the deed does not import, that she shall marry him, &c. This covenant is illegal, and will support no action." Mr. Justice *Aston* said, " If this had been a covenant to marry her, all the consequences, which have been mentioned, would have followed : But it is not a covenant to marry her. The words import no such thing ; and the court cannot suppose fraud." Mr. Justice *Willes* observed, that " As to the motion in arrest of judgment, I should not think it a proper motion, if this was a covenant to marry her. But this is only not to marry another." I have been thus particular in noticing the opinions of the judges in this case, as well as shewing the contract in the very words of it, because I think there is some resemblance, at least, between these opinions, and those which ought to be adopted in the case under consideration.

In the present case, it may be said, that though unhappy differences, may not, in every case, and perhaps but in few cases, be a ground for a separation of husband and wife, yet if, in some cases, they are so, the consideration of the bond, is not clearly bad. It may, under certain circumstances, be good, and under other circumstances, it may be bad. The court, then, are to pronounce the consideration good, if it is not clearly bad. The court, in the case above alluded to, so consider the law. They went on the ground, that the consideration of the agreement, must be absolutely good, without having recourse to any presumptions, or inferences whatever. They could make no inference, either from the contract itself, or from the verdict of the jury, that the defendant engaged to marry the plaintiff. They could make no inference, either from the contract itself, or from her acceptance of it, that there was any mutuality in it ; that she ever engaged to marry him. It might have been argued, perhaps, upon pretty good ground, that if it had appeared by the contract, that she had engaged to

marry him, the contract would have bound him. The court did not say, if that had been the case, it would have bound him. They, however, comment on the mutuality of the contract, as if it were a material fact wanting in the case. At any rate, if the words, "I will not marry with any person besides herself," had been accompanied with the words, "and I engage to marry her," he would have been bound, to be sure, if her engaging to marry him had been the consideration. So much, however, I think may be inferred from the decision in the above case, that the consideration, if stated, must be a valid one, conclusively so. So much, I think also, may be inferred, that these words, under certain circumstances, would have been material, if the court would have been of opinion, in case *Catharine Lowe* had agreed to marry *Newsham Peers*, that the contract, worded as it was on his part, would have bound him.

No more can be said, in the case under consideration, than that unhappy differences may, under certain circumstances, be a ground of separation; and that they may be a good consideration of a contract, grounded on such separation; not that they are uniformly so. But as I have before observed, if the consideration of the contract be set forth, it must appear to be conclusively good.

Upon the whole, I would not reverse the judgment in this case, because the court adjudged the declaration to be insufficient. I think, it is clearly insufficient; in the first place, because the law of this state does not authorize a voluntary separation of man and wife for life, nor any contract grounded on such separation; but in all cases, application must be made to the proper forum, to dissolve the marriage covenant.

Secondly, if there be an extraordinary case, which will warrant such voluntary separation, and a contract grounded thereon, the consideration of such contract, must be set out.

But, thirdly, if an attempt is made to set out the consideration, though the party be not bound to do so, it must be clearly and conclusively good; not so by inference, prob-

ability or possibility ; and that the consideration in this case is not conclusively good, but conclusively bad.

BRAINARD, J. concurred in this last opinion.

EDMOND, J. also dissented to the opinion of the majority of the court.