Merrimack, ⎱
Dec., 1900. ⎰

### FOOTE, *Ex'r, Ap't, v.* NICKERSON.

A voluntary agreement for a separation between husband and wife is contrary to public policy and void.

A contract between husband and wife, which stipulates that neither shall make further demands upon the estate of the other, is not enforceable when it forms an indivisible part of an agreement for a dissolution of the marital relation.

The statute providing that a husband's interest in the estate of his deceased wife shall be barred by his abandonment, absence, or willful neglect to support for the term of three years next preceding her death, does not apply when the separation was by mutual consent.

The statute authorizing a married woman living separate from a non-resident husband to convey property as if she were unmarried does not include a similar disposition of her estate by will.

PROBATE APPEAL. Facts agreed. The defendant, Stephen D. Nickerson, and the plaintiff's testatrix, Martha J. Nickerson, were

married in Maine in 1891, and lived together there until April, 1892, when the testatrix informed her husband that she intended to leave him. Thereupon they agreed to separate, and he executed a writing as follows: " This is to certify that I, Stephen D. Nickerson, husband of Martha J. Nickerson, do mutuously agree to separate on friendly terms, and to make no demand (neither me, nor my heirs) on her, nor her property, after this date." At the same time she executed a similar writing, left him, and came to Bow in this county, where she resided until her decease in 1897. Each party had some property. There was no legal cause for divorce or separation. He continued to reside in Maine, and in no way aided in her support.

By the will the testatrix provided as follows: " I give and bequeath unto my husband, Stephen D. Nickerson, of Orrington, Maine, the sum of one dollar. I make this small bequest because of his agreement to live separate from me and to make no claim upon my estate in any way." The defendant seasonably waived this provision, and upon his petition the executor was ordered to file an inventory and give bonds. From this decree the executor appealed, for the reasons that the defendant had no such interest in the estate as to entitle him to maintain his petition, and that he was estopped by the writing above set out to claim his distributive share in his wife's estate.

*Sargent & Niles*, for the plaintiff.

*Fred H. Gould* and *Charles Hamlin* (of Maine), for the defendant.

PEASLEE, J. One question presented for decision is whether the relation of husband and wife is one that the parties can dissolve or modify; whether the married *status* is so far within the control of the parties that its alteration is a result they can themselves effect, provided they agree upon the terms. It may fairly be said that the question is not settled by the decisions in this state. It has been touched upon incidentally, but in no case has it been directly involved. It therefore becomes necessary to examine the law on the subject elsewhere.

Turning to other jurisdictions, it will be found that the question has been the subject of much litigation, and with varied results. Not only do the cases in one state conflict with those in other states, but in the same jurisdiction the views of one generation have often been held to be erroneous in later times. There is disagreement not only as to what the law is, and what the policy on this subject should be, but also as to the history of the law and how it was held to be in former times. In order, then, to reach a

satisfactory solution of the question it is essential to examine with some minuteness the historical aspect of the law applicable in this case.

The English cases decided before the revolutionary war are conflicting, and many of them apparently imperfectly reported. The precise question here involved did not then come directly before the so-called law courts. All causes concerning marriage and the marital *status* were tried in the ecclesiastical courts, which also had jurisdiction of the probate of wills, and the administration of estates. 2 Bl. Com. 496. While in a narrow sense these were not common-law courts, they administered the unwritten law of the realm upon these subjects. Although the inferior judges were appointed by the ecclesiastics, the bishops themselves were nominated by the king. 1 Bl. Com. 280. In all causes an appeal might be taken to the king, who was represented by the court of delegates appointed by him for that purpose. " This commission is frequently filled with lords, spiritual and temporal, and always with judges of the courts at Westminster, and doctors of the civil law." 3 Bl. Com. 66. The law thus administered is a part of the common law of England. *Regina* v. *Millis*, 10 C. & F. 534, 671. To ascertain the state of the English common law as to divorce, suits for nullity, and other matters directly concerning the marital relation, recourse must be had to the decisions of those courts. The doctrine of either total or partial divorce by agreement of the parties found no favor there. They were not permitted to "release themselves by any private act of their own, or for causes which the law itself has not pronounced to be sufficient and sufficiently proved." *Mortimer* v. *Mortimer*, 2 Hag. Con. 310, 318 ; 2 Rop. H. & W. 267. The rule that separation agreements are wholly void seems to have been adhered to from the earliest times until the court was abolished in 1857, by the statute of 20 & 21 Vict., chapter 85. *Smith* v. *Smith*, 2 Hag. Ecc. Sup. 44, note ; *Westmeath* v. *Westmeath*, *Ib.* 1,— *S. C.*, 4 Eng. Ecc. 258 ; *Barlee* v. *Barlee*, 1 Add. Ecc. 301, 305 ; *Nash* v. *Nash*, 1 Hag. Con. 140.

There are some very early cases wherein contracts of husbands with a third person concerning the support of their wives were enforced in chancery. In *Seeling* v. *Crawley*, 2 Vern. 386, decided in 1700, Crawley, who had separated from his wife, made a contract with her father, Seeling, that the wife and a child should be supported at her father's house. Upon a bill brought by the father, in which the wife joined, performance of the husband's covenants was decreed. The contract did not depend upon a separation agreement. In other cases decided at about the same time, the court seems to have proceeded partly upon the theory that in case of wrongdoing by the husband chancery had power to decree sep-

arate maintenance. *Oxenden* v. *Oxenden*, 2 Vern. 493; *Nicholls* v. *Danvers*, 2 Vern. 671. These cases may have resulted from confused ideas about the respective jurisdiction of the ecclesiastical and chancery courts, incident to and following after the abolition of the former during the Commonwealth. 1 Fonb. Eq. 97, note *n.*

The early cases in the law and equity courts which really bear upon this question are those wherein the validity of the agreement was incidentally drawn in question. Of these, one of the earliest that is reported is *Lister's Case*, 8 Mod. 22, decided in 1721. A wife, living separate from her husband under an agreement, sued out a writ of *habeas corpus* to be freed from imprisonment by him in the mint. The court said: "An agreement between husband and wife to live separate, and that she shall have a separate maintenance, shall bind them both until they both agree to cohabit again; and if the wife be willing to return to her husband, no court will interfere to obstruct her. But as to the coercive power which the husband has over his wife, it is not a power to confine her; for by the law of England she is entitled to all reasonable liberty, if her behavior is not very bad." According to this report, the decision was put upon two grounds — that the agreement cut off the husband's rights, and that his rights did not in any event entitle him to such means of coercion. Strange reports the case somewhat differently. He says: "And all this matter appearing, and that he declared he took her into his power in order to prevail with her to part with some of her separate maintenance; the chief justice declared, and all the rest agreed, that where the wife will make an undue use of her liberty, either by squandering away the husband's estate, or going into lewd company, it is lawful for the husband, in order to preserve his honor and estate, to lay such a wife under restraint. But where nothing of that appears he cannot justify the depriving her of her liberty; that there was no color for what he did in this case, there being a separation by consent." *S. C., sub nom. Rex* v. *Lister*, 1 Stra. 478. If the latter report states the opinion correctly, the case is not authority for the proposition that such agreements are valid. It only decides that the husband may lay the wife under restraint when she squanders his property or goes into lewd company, and that her mere leaving him in accordance with their mutual agreement does not make out a cause for such action.

In 1725, *More* v. *Freeman*, Bunb. 205, was decided. The wife of Sir Cleaves More had separate estate payable by trustees to whom she should appoint. She was living apart from him in adultery. Upon his forcibly retaking her, she appointed a portion of the property to him, in consideration of his promise to allow her to live separate. The execution of the power was held to be good.

There was no discussion of the validity of the agreement to live apart. This case has been somewhat relied upon as upholding separation agreements; but the better opinion is that it merely decides that she might give the property to whom she chose, and that without any consideration. 2 Rop. H. & W. 294, note.

*Fitzer* v. *Fitzer,* 2 Atk. 511 (decided in 1742), related to a contract to maintain the wife at a place other than her husband's residence. The decision was that the agreement of the husband to so far perform his marital duty was binding upon him.

In 1747, Lord Chancellor *Hardwicke* said: " I do not find that this court ever made a decree for establishing a perpetual separation between husband and wife, or to compel a husband to pay a separate maintenance to his wife, unless upon agreement between them, and even upon this unwillingly." *Head* v. *Head,* 3 Atk. 547.

In 1757, a writ of *habeas corpus* was issued at the instance of John Wilkes to obtain the custody of his wife, who was living with her relatives under a separation agreement. " The court held this agreement to be a formal renunciation by the husband of his marital right to seize her or force her back to live with him." *Rex* v. *Mead,* 1 Bur. 542. In view of the decision in *Lister's Case,* 8 Mod. 22, that he had no such right to renounce, the case cannot be considered a satisfactory authority. " When I see such *dicta* as occur in the case of *King* v. *Mead* falling from great men, and establishing a course of decision that can be demonstrated to stand upon no principle consistent with the law of the land, I feel great difficulty in deciding upon such authority." Lord *Eldon, St. John* v. *St. John,* 11 Ves. Jr. 526, 529. Its value is further impaired by a decision of the court of chancery, rendered the same year, dismissing a bill so far as it related to the setting up of an agreement to live separate. *Wilkes* v. *Wilkes,* 2 Dick. 791.

In 1776, it was decided that a married woman living apart from her husband could not be sued as a *femme sole,* " except in the known excepted cases of abjuration, exile, and the like, where the husband is considered as dead and the woman as a widow." *Hatchett* v. *Baddeley,* 2 Wm. Bl. 1079, 1082. The same conclusion was reached in another case, decided two years later. *Lean* v. *Schutz,* 2 Wm. Bl. 1195.

The English common law relating to this subject (which became the common law of this state, so far as applicable to conditions here) was that as to the settlement of estates, suits for nullity of marriage, and such limited divorce as was then granted, a separation agreement was wholly void. It was refused recognition in chancery, and even in the law courts its efficacy was denied by the later cases. The only case actually deciding that such an agreement was a valid modification of the marriage contract was *Rex* v.

*Mead,* 1 Bur. 542; and this was not followed in the cases in 2 Wm. Bl. Contemporary judges and text-writers understood this to be the state of the law. It was so laid down by Lord *Mansfield,* who had been chief justice of the king's bench since 1756, and, who, shortly after the decision of these cases, thought that the law should be held otherwise because of changed conditions. *Ringsted* v. *Lady Lanesborough,* 3 Doug. 197, 203; *Barwell* v. *Brooks,* 3 Doug. 371, 373; *Corbett* v. *Poelnitz,* 1 T. R. 5. The modern English doctrine differs widely from this; and an examination of its origin and development shows that it is a departure from the old law, and not merely an adaptation of recognized principles to changed conditions.

It was immediately after the rendition of the decisions reported by Blackstone that changes in the law began to be made. In 1783, Lord *Mansfield,* while admitting that the common law was otherwise, held that an agreement for separation bound both parties as though they were sole. The point at issue was whether the wife could be sued alone. The fact that these agreements had come into use, and by them separate estates had been given to wives, who for that reason ought to be liable to suit, was considered to be of controlling importance. The question of the effect of the decision upon the marital *status* was not discussed. *Ringsted* v. *Lady Lanesborough,* 3 Doug. 197. The object of the decision plainly was to accomplish what has been done here by legislation. It gave married women a limited power to contract and sue and be sued. A similar result was reached the following year. Lord *Mansfield* said: "The fashion of the times has introduced an alteration, and now husband and wife may, for many purposes, be separated and possess separate property, a practice unknown to the old law." *Barwell* v. *Brooks,* 3 Doug. 371, 373.

In 1794, the new doctrine was affirmed in the leading case of *Corbett* v. *Poelnitz,* 1 T. R. 5. Lord *Mansfield* again justified the result by reasoning similar to that just quoted. These cases "introduced a new principle into the English law respecting the relations of husband and wife; but a principle that was familiar to the Roman law and to the municipal law of most of the nations of Europe." 2 Kent *159. It was natural that this principle should appeal to Lord *Mansfield,* whose work is so distinguished for its upbuilding of commercial law. So long as he remained upon the bench these cases were followed. Accordingly, in 1788, Mr. Justice *Buller* said that separation deeds were valid when fairly entered into, and that courts of equity had jurisdiction to enforce them. *Fletcher* v. *Fletcher,* 2 Cox Ca. Ch. 99. In another case he said that it had been decided that by agreement the parties could make the wife a *femme sole* as to everything but the right of remarriage. *Comp-*

*ton* v. *Collinson*, 2 Bro. Ch. 377. The case went off upon another point, and the cases upon this question are not cited.

Acquiescence in the doctrine of *Corbett* v. *Poelnitz* was by no means uniform. The case "gave rise to great scrutiny and criticism. It was considered as a deep and dangerous innovation upon the ancient law." 2 Kent *159. Lord *Mansfield* retired in 1788. His successor, Lord *Kenyon*, had passed most of his life as a law writer for more successful practitioners, and as a judge of an inferior court in a remote part of the kingdom. His reverence for the law was as great as Mansfield's devotion to progressive ideas. The effect of the change is plainly traceable in the decisions upon this subject. In 1790, the case of *Compton* v. *Collinson*, *supra*, having been sent out from chancery for the opinion of the court of common pleas upon the law, Lord *Loughborough* said that the question of a separated wife's liability to suit was still an open one. *S. C.*, 1 H. Bl. 334. In the same year the ecclesiastical court again declared its adherence to the doctrine heretofore noticed. *Nash* v. *Nash*, 1 Hag. Con. 140.

In 1792, the chancery court, following the *dictum* of Justice *Buller* in *Fletcher* v. *Fletcher*, decreed specific performance of articles of separation, in the face of the husband's offer to return and live with his wife. *Guth* v. *Guth*, 3 Bro. Ch. 614. This case was never considered sound. Soon after its decision, Lord *Loughborough* denied equity jurisdiction of suits involving the marital relation. *Legard* v. *Johnson*, 3 Ves. Jr. 352, decided in 1797.

Again in 1792, Justice *Buller* expressed his adherence to the law as held by Lord *Mansfield*. A writ of *habeas corpus* was directed, at the instance of J. Greygoose, to bring up the body of his wife. It was alleged that she was detained by the defendant and living with him in adultery. One defence set up, but not fully pleaded, was a separation contract, and *Rex* v. *Mead*, 1 Bur. 542, was relied upon. Justice *Buller* said: "If this case turn out on farther examination to be like that in Burrow, I am strongly inclined to think that would be an answer to the writ. But that is not at present made out." *Rex* v. *Winton*, 5 T. R. 89. The chief justice was absent when this decision was rendered.

The question was considered by Lord *Kenyon* in 1794, when he declared that if changes in the law were needed they must be made by the legislature. The authority of *Corbett* v. *Poelnitz* was doubted, but the non-liability of the defendant was finally put upon other grounds. *Ellah* v. *Leigh*, 5 T. R. 679. This was after Justice *Buller* had retired from the king's bench, to accept a seat upon the common bench. Two years later, when speaking of the same subject, Lord *Kenyon* said : "We must not by any whimsical conceits, supposed to be adapted to the altering fashions of the

times, overturn the established law of the land. It descended to us as a sacred charge, and it is our duty to preserve it." *Clayton* v. *Adams*, 6 T. R. 604.

A decision of his in 1793 has sometimes been referred to as inconsistent with the views expressed in the cases just cited. In a suit for the seduction of a wife, the defence was set up that before the commission of the acts complained of the husband and wife had voluntarily separated. It was decided that this went to the merits of the action. *Weedon* v. *Timbrell*, 5 T. R. 357. The real ground of the decision was that this action is not maintainable by one who has abandoned the right upon which the action is founded. It does not decide that rights had been acquired under a valid contract. In harmony with this view, the same judge held that the fact that the husband was living in adultery was a bar to his suit. *Wyndham* v. *Wycombe*, 4 Esp. 16. While this decision was erroneous (*Cross* v. *Grant*, 62 N. H. 675, and cases cited), it is of importance as showing that *Weedon* v. *Timbrell* was not based upon the proposition that a separation agreement is a valid contract.

In 1800, the question involved in *Corbett* v. *Poelnitz* came before Lord *Eldon*. He refrained from deciding it because it was then pending in a case which was soon to be argued before all twelve judges, but he reviewed the cases and manifestly was of the opinion that the decision of Lord *Mansfield* was unsound, and that *Rex* v. *Mead*, 1 Bur. 542, was not an authority for the validity of separation agreements. *Beard* v. *Webb*, 2 B. & P. 93.

In the case there referred to the question was fairly presented for decision. It was twice argued before all the judges, except Justice *Buller*, who was incapacitated by the illness of which he died shortly thereafter. All concurred in the opinion of the chief justice, overruling *Corbett* v. *Poelnitz*. Lord *Kenyon* said: " If . . . the parties were competent to contract at all, it would then become material to consider how far a compact can be valid which has for its object the contravention of the general policy of the law in settling the relations of domestic life, and which the public is interested to preserve; and which without dissolving the bond of marriage would place the parties in some respects in the condition of being single, and leave them in others subject to the consequences of being married; and which would introduce all the confusion and inconvenience which must necessarily result from so anomalous and mixed a character. In the course of the argument some of these difficulties were pointed out, and it was asked whether, after such an agreement as this, the temporal courts could prohibit if either were to sue in the ecclesiastical court for the restitution of conjugal rights? Whether the wife, if she committed a felony in the presence of her husband, would be liable to convic-

tion? Whether they could be witnesses for or against each other? Whether they could sue and take each other in execution? And many other questions will occur to every one, to which it will be impossible to give a satisfactory answer. For instance, it may be asked how it can be in the power of any persons by their private agreement to alter the character and condition which by law results from the state of marriage while it subsists, and from thence to infer rights of action and legal responsibilities as consequences following from such alteration of character and condition; or how any power, short of that of the legislature, can change that which by the common law of the land is established as the course of judicial proceedings." *Marshall* v. *Rutton,* 8 T. R. 545. Chief Justice *Eyre,* of the common pleas, who retired shortly after the first argument of the case, also concurred in this opinion.

It was thus that the law stood until the death of Lord *Kenyon* in 1802. During that year a case arose involving the validity of an agreement between George Chambers, his wife, and certain trustees. The husband agreed that in case of a future separation the wife might live where she chose, without molestation from him, and that he would make certain payments to the trustees for her. A separation took place, the payments were not made, and the trustees sued on the covenant. The case was argued upon the general invalidity of separation agreements, and especially upon the point that an agreement looking to a future separation is illegal. Lord *Ellenborough,* C. J., held the contract to be valid, upon the ground that "the question which has been agitated appears to have been laid at rest for a long period, by repeated decisions and the uniform practice of the courts." So far as the agreement related to a future separation, he declared it was no worse than others which had been upheld. *Rodney* v. *Chambers,* 2 East 283. The case of *Nicholls* v. *Danvers,* 2 Vern. 671, was relied upon as authority for the proposition. It is true that, taking that case as reported by Vernon, such a holding might perhaps be inferred. There was such an agreement between the parties, but the court did not enforce it. Proceedings for cruelty had been had in the ecclesiastical court (1 Fonb. Eq. 97, note); and this was merely an application for alimony, in accordance with the practice in the chancery courts after the Restoration. Thus, in two years' time, at the first term presided over by Lord *Ellenborough,* the conservative doctrines laid down by Lord *Kenyon* were disapproved of, and a decision was rendered of so radical a nature that it finds no support in the cases preceding it and has not since been followed as an authority. A side-light upon this case is seen in the reference to the wife as "the Honorable Jane Rodney," and to the husband as "George Chambers."

In the following year, Lord *Eldon* expressed a strong disapproval of *Rodney* v. *Chambers*, and of the whole doctrine of separation agreements. He suggested, however, that the practice of upholding them to a limited extent (that is, as to property rights) might have become too firmly established to be overturned. The case went off upon a question of pleading, and was then settled by the parties. *St. John* v. *St. John*, 11 Ves. Jr. 526.

In 1804, the master of the rolls recognized the validity of an agreement to pay an annuity to a separated wife, without discussion of the question. *Cooke* v. *Wiggins*, 10 Ves. Jr. 191.

In 1806, the common pleas, by a divided court, held that an unfulfilled agreement to pay a separate allowance did not free the husband from liability for necessaries thereafter furnished to his separated wife. *Nurse* v. *Craig*, 2 B. & P. N. R. 148. Sir *James Mansfield*, C. J., dissented, following the reasoning of Lord *Mansfield* in the earlier cases.

In *Worrall* v. *Jacob*, 3 Mer. 256, 268 (decided in 1817), Sir *William Grant*, master of the rolls, said: " I apprehend it to be now settled that this court will not carry into execution articles of separation between husband and wife. It recognizes in them no power to vary the rights and duties growing out of the marriage contract, or to effect, at their pleasure, a partial dissolution of that contract. It should seem to follow that the court would not acknowledge the validity of any stipulation that is merely accessory to an agreement for separation. The object of the covenant between the husband and the trustee is to give efficacy to the agreement between the husband and the wife ; and it does seem rather strange that the auxiliary agreement should be enforced, while the principal agreement is held to be contrary to the spirit and the policy of the law." He also quotes from Lord *Eldon* as follows : " If this were *res integra*, untouched by *dictum* or decision, I would not have permitted such a covenant to be the foundation of an action or a suit in this court. But if *dicta* have followed *dicta*, or decision has followed decision, to the extent of settling the law, I cannot, upon any doubt of mine as to what ought originally to have been the decision, shake what is the settled law upon the subject." *St. John* v. *St. John*, 11 Ves. Jr. 526. Accordingly, effect was given to an appointment by a separated wife of property deeded by the husband to trustees, in consideration of their agreement to save him harmless from his wife's debts, etc.

Shortly thereafter, the ecclesiastical court again reiterated its adherence to the view that these agreements are void. " These courts, therefore, to which the law has appropriated the right of adjudicating upon the nature of the matrimonial contract, have uniformly rejected such covenants as insignificant in a plea of bar ;

and leave it to other courts to enforce them, so far as they may deem proper upon a more favorable view (if they entertain it) of their consistency with the principles of the matrimonial contract. *Mortimer* v. *Mortimer*, 2 Hag. Con. 310, 318.

In 1821, a bill in equity was brought for the cancellation of separation deeds, upon the ground that they were contrary to the policy of the law and void. The bill was dismissed, for the reason that if the plaintiff's contention was sound it was as good a defence to the deed at law as in equity. Lord *Eldon*, again considering the question at some length, said: "I perceive that it seems to have struck every one as extraordinary that such deeds should ever have been supported. . . . It has always seemed to me very difficult to hold these deeds legal. It seems to be admitted that a mere agreement to live separate is one that would not be deemed valid; and it seems strange, as Sir *William Grant* observes, that if the primary object be vicious these auxiliary provisions should be held good, and thereby the objects which the law objects to should be carried into effect." *Westmeath* v. *Westmeath*, Jac. 126, 141, 142.

Other chancery judges entertained different views. Upon demurrer to a bill brought to recover arrears of an annuity due under a separation agreement, *Richards*, lord chief baron of the exchequer, said: "The question is not what the law ought to be, but what it is, and the opinions of judges, however great and learned, are not to be put in competition with decisions determining the point and settling the law." Baron *Graham* said: "The language of regret is certainly found to be used by many of the judges; but the law is clearly established, and such demands have been constantly enforced." Notwithstanding this declared confidence in the settled state of the law, the chief baron also said that the case involved "a grave question, of too great importance to be disposed of on demurrer." *Ros* v. *Willoughby*, 10 Price 2, decided in 1822.

Cases following soon after this held that separation deeds are valid, so far as they relate to an annuity for the wife (*Jee* v. *Thurlow*, 2 B. & C. 547 [1824]; *Wilson* v. *Mushett*, 3 B. & Ad. 743 [1832]); but invalid if the separation does not take place until a future day. *Hindley* v. *Westmeath*, 6 B. & C. 200 [1827].

In 1835, the question first came before the house of lords. A Scotch nobleman had obtained a divorce from his wife in the courts of that country, and one question was whether the wife was within the jurisdiction of the court and duly served with process. The decision turned upon the fact as to her residence; and as she was living apart from her husband, under a separation agreement, it was argued that she was no longer domiciled where

he was.    In speaking of the agreement, Lord *Brougham* said:
" What is the legal value or force of this kind of agreement in
our law?    Absolutely none whatever — in any court whatever —
for any purpose whatever, save and except only one — the obliga-
tion contracted by the husband with trustees to pay certain sums
to the wife, the *cestui que trust*.    In no other point of view is
any effect given by our jurisprudence, either at law or in equity,
to such a contract.    No damages can be recovered for its breach;
no specific performance of its articles can be decreed.    No court,
civil or consistorial, can take notice of its existence.    So far has
the legal presumption of cohabitation been carried by the common
law courts, that the most formal separation can only be given in
mitigation of damages, and not at all as an answer to an action for
criminal conversation, the ground of which is the alleged loss of
comfort in the wife's society; and all the evidence that can be
adduced of the wife's living apart, and all the instruments that
can be produced binding the husband to suffer the separate resi-
dence of his wife,— nay, even when he has for himself stipulated
for her living apart, and laid her under conditions that she should
never come near him,— all is utterly insufficient to repel the claim
which he makes for the loss of her society, without doing any act
either in court or in *pais* to determine the separation agreement."
Lord *Lyndehurst* said: " The strongest articles of separation may
be drawn up and signed with full acquiescence of the husband and
wife, yet he may sue her and she may sue him notwithstanding."
*Warrender* v. *Warrender*, 2 C. & F. 488, 527, 561.

In the same year, the case of *Waite* v. *Jones*, 1 Bing. N. C. 656,
was decided in the court of common pleas.    The plaintiff sued
for money agreed to be paid in consideration of his executing a
deed of separation from his wife.    The defence was that the
promise to execute the deed was illegal, and vitiated the whole
agreement.    The court held that agreements for future separation,
or promises of payments to induce the same, are illegal; but that
an agreement for a present separation may be valid.    It was ad-
mitted that a promise to separate in consideration of a sum of
money was not binding; but this agreement was upheld because
it might be inferred that the separation had already taken place,
and it did not affirmatively appear that this promise induced such
action.    Upon appeal to the exchequer chamber, the decision was
affirmed by a divided court.    Lord *Denman*, C. J., dissenting, dis-
approved of separation deeds, and said: "If I could venture to
lay down the principle which alone seems to be safely deducible
from all these cases, it is this: that when a husband has by his
deed acknowledged his wife to have a just cause of separation
from him, and has covenanted with her natural friends to allow her

a maintenance during separation, on being relieved from liability to her debts, he shall not be allowed to impeach the validity of that covenant." *Jones* v. *Waite*, 5 Bing. N. C. 341. The judgment was affirmed in the house of lords, and the contract was upheld in a brief opinion. *Jones* v. *Waite*, 4 M. & G. 1104 [1842].

From this time on, it seems to have been the law of England that such contracts are enforceable, except as to the one provision which is of their essence. Courts accepted the rule, while acknowledging the lack of reason for it. " It is in vain to regret the perplexities in which courts have found themselves involved by enforcing the minor and auxiliary parts of the agreement to separate, while they profess to repudiate the principal and essential part and motive of it." *Frampton* v. *Frampton*, 4 Beav. 287, 293 [1841].

In 1848, the house of lords held unequivocally that a separation agreement is a valid contract; and specific performance of the covenants of the deed was decreed. *Wilson* v. *Wilson*, 1 H. L. C. 538. The case goes solely upon the ground of recent decisions, admitting that the holding is opposed to earlier precedents. The deed was made to settle the wife's suit for nullity in the ecclesiastical court, and the case might have been distinguished on that ground.

Shortly after this, Lord *Romilly*, master of the rolls, enjoined the breach of a covenant not to interfere with the wife, who was living separate. The upholding of separation deeds " in a great number of cases " is the only reason assigned for the decision. *Sanders* v. *Rodway*, 16 Beav. 207 [1852].

The doctrine of these later cases was not wholly approved of, and in 1858 the court declared that the very basis of the contract was an agreement which could not be enforced in any court. *Vansittart* v. *Vansittart*, 2 DeG. & J. 249. In most cases, however, the general tendency toward upholding the agreement was followed. *Webster* v. *Webster*, 1 Sm. & G. 489 ; *Randle* v. *Gould*, 8 E. & B. 457 ; *Williams* v. *Baily*, L. R. 2 Eq. Ca. 731 ; *Rowley* v. *Rowley*, L. R. 1 H. L. Sc. 63 ; *Gibbs* v. *Harding*, L. R. 8 Eq. Ca. 492.

Lord Chancellor *Westbury*, in 1862, enjoined a suit for restitution which had been begun in the divorce court, contrary to the stipulation of a separation deed. The divorce court had succeeded to the jurisdiction of the ecclesiastical court in 1857 (20 & 21 Vict., c. 85), and administered the law in a similar manner. *Ib.*, s. XXII. The chancellor justified the decision by reasoning that separation deeds were valid, although the ecclesiastical doctrine was different, because by a statute of Henry VIII the ecclesiastical law was subordinated to the common law ; that the decision of the house of lords in *Wilson* v. *Wilson*, 1 H. L. C. 538, overruling the earlier cases, must be treated like a statute ; and that while a

voluntary separation was an offence against the ecclesiastical law, it was not one against the common law, and therefore the rights in controversy were only private, and public policy was not involved. *Hunt* v. *Hunt*, 4 DeG. F. & J. 221. The case was appealed to the house of lords; but no decision was rendered, as Mrs. Hunt died *pendente lite.* See *Brown* v. *Brown*, L. R. 7 Eq. Ca. 185, 191. The reasoning of this case does not seem to have been followed, but its conclusions have been adopted.

In 1869, a separation deed where no separation followed was held void, not because of its illegality as facilitating a future separation (the reason given in all the earlier cases), but because the consideration for the agreement had failed. *Brindley* v. *Mullourney*, L. R. 7 Eq. Ca. 343.

In 1879, Sir *William Jessel*, master of the rolls, treated the question as settled by the later cases. "For a great number of years both ecclesiastical judges and lay judges thought it was something very horrible and against public policy that husband and wife should agree to live separate, and it was supposed that a civilized country could no longer exist if such agreements were enforced by courts of law, whether ecclesiastical or not. But a change came over judicial opinion as to public policy, and other considerations arose, and people began to think that after all it might be better and more beneficial for married people to avoid in many cases the expense and the scandal of suits of divorce, by settling their differences quietly by the aid of friends out of court, although the consequence might be that they would live separately; and that was the view carried out by the courts when it became once decided that separation deeds were not *per se* against public policy." *Besant* v. *Wood*, L. R. 12 Ch. Div. 605. In that case the agreement provided that each party should have the custody of one child. Afterward the father sued for and obtained custody of the one with the mother, the court treating the agreement touching that subject as void. Thereupon the wife sought to renew cohabitation; "but the court deemed that the policy of the law made her agreement for separation controlling over her, and the consideration for it void as to him. This exquisitely refined principle of high honor does not pertain to the laws of so young a people as we are." 1 Bish. Mar. & Div., s. 634a, note.

In the same year, it was again decided that an agreement not to demand restitution of conjugal rights is a valid contract; and that, since by the judicature acts of 1873 all defences are made available in the divorce courts that would be available in equity, the covenant is a bar to proceedings for restitution. *Marshall* v. *Marshall*, L. R. 5 Pro. Div. 19.

Finally, in 1888, it was decided that a trustee is no longer nec-

essary, and that the parties may make the contract directly with each other. *McGregor* v. *McGregor*, L. R. 20 Q. B. 529. This decision is expressly put upon common-law grounds, and in no way depends upon statutes enlarging the powers of married women.

It appears that the present position of the English courts has been reached by means of a gradual abandonment of common-law doctrines. It originated in the undoubted proposition that an agreement by the husband to support his wife is not in violation of marital obligation, but a part performance of the duties thereby imposed. From this has come the whole elaborate system of annuities and other property arrangements, each finding its real, if not ostensible, consideration in an agreement to live separate. For a time some other consideration was always shown, as, for example, the promise of a third person to furnish support to the wife. Later, this concession to the old law was abandoned; and while courts acknowledged the inconsistency of their position, they enforced property arrangements that depended solely upon a principal agreement which was declared to be invalid. Nor did fallacious reasoning stop here. The argument next advanced was that while it was true courts in words denied the validity of these agreements, by judgments enforcing provisions dependent upon them, the judges really decided that separation agreements were good contracts. It was not without some vigorous protest that this line of argument was accepted as sound, but it finally prevailed. In one phase after another it was adopted, until now it seems to be held that as to everything but the right to remarry the parties may divorce themselves.

This wide departure from the common law has been induced by conditions which do not exist here. The arrangement of property matters through trustees, which forms so large a part of English conveyancing that half of the property in England is vested in nominal owners (2 Kent *182), is practically unknown in this state. It is to the conveyancers, and their eagerness in seizing upon each new opportunity for arranging property matters, that the present results are largely due. Running through many of the opinions is found the idea that these conveyances are now so common that the titles to large amounts of property depend upon them; and, therefore, they cannot safely be disturbed. Another fruitful source of such agreements was that there was practically no divorce from the bonds of matrimony in England. These causes do not exist here. The decisions which were in part induced by such conditions and in part by the notions of the times as to "social policy" (*Wennhak* v. *Morgan*, L. R. 20 Q. B. Div. 635), are not authority here, when they conflict with the common law. The doctrine adhered to by Lord *Kenyon*, that if changes in the law

are needed they must be made by the legislature, still prevails in this state.

The modern English rule has not been generally adopted in this country. Few, if any, American courts have ever gone so far as to enforce an agreement to live in separation, or have even sustained covenants incident to such an agreement, except upon facts assumed to be sufficient to avoid a holding that the promise to live apart is valid.

In a few states it is declared that these agreements are wholly void. *Collins* v. *Collins*, Phil. Eq. (N. C.) 143; *Simpson* v. *Simpson*, 4 Dana 140, 142. The general doctrine of these cases does not seem to differ materially from that of most of the American authorities; but the application of the rule to contracts in part dependent upon an illegal covenant is more logical and satisfactory.

Some of the late decisions in New York approach more nearly to the modern English theory than those in other states. The great number of reported cases in which these agreements are involved, in one way or another, shows that they have come to be in common use there. As in England, the law supporting them has developed from small beginnings. In 1811, in the case of *Baker* v. *Barney*, 8 Johns. 72, it was decided that a husband who had provided suitably for a separated wife was not liable for goods thereafter furnished to her; but that in the absence of such provision he was liable for necessaries, in spite of her agreement to the contrary. There was no discussion of the validity of agreements to live separate, and the case is disposed of in a brief *per curiam* opinion. Two years later, it was relied upon as an authority for the proposition that upon the execution of a separation agreement the marriage union "essentially ceased," and therefore the husband and wife were competent witnesses for or against each other. *Fenner* v. *Lewis*, 10 Johns. 38.

The weight of this case is much lessened by the later opinion of the then chief justice. "The general principle is established that the law does not authorize or sanction a voluntary agreement for a separation between husband and wife. . . . A private separation is an illegal contract, a renunciation of stipulated duties from which the parties cannot release themselves by any private act of their own. . . . Nothing can be clearer or more sound than this conjugal doctrine." 2 Kent *176, note *b*.

It was next held that a bond for separate maintenance, which was assumed to be based upon a contract to continue to live apart, was valid and enforceable so long as the separation continued. *Baker* v. *Barney*, 8 Johns. 72, was relied upon, and no distinction was noted between agreements which do and those which do not depend upon a covenant to continue to live apart. *Shelthar* v. *Gregory*, 2 Wend. 422 [1829].

Relying upon these cases, Chancellor *Walworth,* although joining in Lord *Eldon's* expressions of regret at the state of the law, held that an agreement for an immediate separation was valid if made through a trustee. *Carson* v. *Murray,* 3 Paige 483 [1832]. The opinion also stated that a return to cohabitation would restore the husband to all his marital rights. The logic by which it is held that the mere agreement to live apart is invalid, and that the covenant as to maintenance can be sustained only through a trustee, leads inevitably to the conclusion that the covenant does not in any way affect marital rights. When it is also held that a return to cohabitation restores such rights and puts an end to the contract with the trustee, it becomes evident that the true reason which led the court to sustain the agreement in the first instance was not given. If the covenant did not affect marital rights, its rescission could not restore them. If the rescission of the covenant was a necessary accompaniment of the restoration of marital rights, its original execution must have had to do with taking them away. This decision fairly illustrates the course taken in other cases in the court of chancery. *Rogers* v. *Rogers,* 4 Paige 516 ; *Heyer* v. *Bruger,* Hoff. Ch. 1 ; *Champlin* v. *Champlin,* Hoff. Ch. 55 ; *Anderson* v. *Anderson,* 1 Edw. Ch. 380 ; *People* v. *Mercein,* 8 Paige 47.

These cases were not always approved of. In *Mercein* v. *People,* 25 Wend. 64, 77, Justice *Bronson* said: "It is well worthy of consideration whether all agreements based on the voluntary separation of husband and wife are not contrary to law and absolutely void." Chief Justice *Nelson,* in delivering the opinion of the court denying to such an agreement the effect of placing the wife on the footing of a *femme sole* as to suits at law, said that in courts of law the agreement was "condemned as waste paper, by the soundest principles of policy, morality, and law." *Beach* v. *Beach,* 2 Hill 260.

In many of the later cases agreements for support and as to property have been upheld, apparently without much regard to whether they in fact depended upon a covenant to continue to live separate (*Carpenter* v. *Osborn,* 102 N. Y. 552 ; *Pettit* v. *Pettit,* 107 N. Y. 677 ; *Galusha* v. *Galusha,* 116 N. Y. 635 ; *Clark* v. *Fosdick,* 118 N. Y. 7), until the court declared in terms that "it is settled in this state that a contract between a husband and wife who have separated to thereafter live apart is not void on the ground of public policy." *Duryea* v. *Bliven,* 122 N. Y. 567. This proposition is perhaps modified or explained by the very recent opinion in which the court said that "it must be borne in mind that a contract between husband and wife is void at law and upheld solely in equity, and then not in every case, but only when the provision

for the maintenance of the wife or children is suitable and equitable." *Hungerford* v. *Hungerford,* 161 N. Y. 550, 553. In some other later cases agreements of this sort are disapproved of. *Poillon* v. *Poillon,* 49 N. Y. App. Div. 341; *Whitney* v. *Whitney,* 4 N. Y. App. Div. 597; *Friedman* v. *Bierman,* 43 Hun 387.

In Massachusetts, actions to enforce the husband's agreement to pay money to or for a separated wife have been sustained. *Page* v. *Trufant,* 2 Mass. 159; *Holbrook* v. *Comstock,* 16 Gray 109; *Fox* v. *Davis,* 113 Mass. 255. The question of the validity of such an agreement when inseparable from a covenant to continue to live apart arose in *Albee* v. *Wyman,* 10 Gray 222. The court considered the English rule to be open to grave objections, and disposed of the case upon other grounds. In a recent case the agreement was sustained because the covenant to pay money for support was separable from others which were objectionable. *Grime* v. *Borden,* 166 Mass. 198.

In the United States courts, agreements for a separate maintenance are upheld. Whether they would be if they depended upon an agreement to continue to live apart, is a question the court was not called upon to consider; and it declined to discuss the subject in any aspect the case did not present. *Walker* v. *Walker,* 9 Wall. 743.

The question was early before the Connecticut court, and gave rise to much discussion. It was finally decided, by a vote of five to four, that a contract for separate maintenance was valid if made for what the court termed proper cause; and that while " there may be cases of separation by agreement, attended with such circumstances and resting on such foul principles that good policy will not support them, . . . when a case is claimed to be of that description it is incumbent on those who claim it so to show it." *Nichols* v. *Palmer,* 5 Day 47, 52, 53. A discretionary power of this kind is broad and somewhat novel. The practical result of exercising it would be what is set forth in one of the dissenting opinions : " It is true, it has been said, that such separations should be admitted only in cases of the most urgent necessity, and for the strongest reasons; but no line of demarcation can be drawn. This decision proclaims to all who are married, that. they have the right to separate by mutual consent, as whim, fancy, or passion may dictate." *Ib.* 60. The true rule is stated in the dissenting opinion of Judge *Ingersoll :* " The marriage contract cannot, *ad libitum,* be dissolved by the parties. Nay, I presume in every case application must be made to a forum, appointed by law for the purpose, to effect a dissolution. It follows then, of course, that every agreement the consideration of which is the dissolution, or the intended dissolution, of the marriage contract, is void, and cannot

be enforced in a court of justice. What, then, is a dissolution of it? I should suppose, an agreement to live separately, and to perform none of the duties to each other, which they solemnly promised to perform when the marriage took place, is a dissolution of the contract so far as the parties can dissolve it. If this be a just position, every agreement to carry into effect such separation must be against the law. The agreement in question, being made to carry into effect such separation, by fair logical deduction is against law and void." · *Ib.* 61.

In a recent case the court of that state said of these contracts : " The principle upon which they are sustained is, not that the separation should be enforced, nor that it is lawful for the parties to contract to separate, but that when they are living apart for causes rendering such separation reasonably necessary the agreement of the husband to perform his duty to furnish support for his wife should be carried out." *Boland* v. *O'Neil,* 72 Conn. 217.

" After a marriage is entered into the relation becomes a *status,* and is no longer one resting merely on contract. It is the relation fixed by law in which the married parties stand to each other, toward all other persons, and to the state. And it is a relation from which the persons cannot separate themselves by their own agreement, or by their own misconduct. This *status* can only be dissolved between living parties by the assent of the state, which is ordinarily indicated by the judgment of a competent court. When an attempt is made through the courts to undo a marriage, the state becomes in a sense a party to the proceedings, not necessarily to oppose, but to make sure that the attempt will not prevail without sufficient and lawful cause shown by the real facts of the case, nor unless those conditions are found to exist at the time the decree is made upon which the state permits a divorce to be granted. The state has an interest in the maintenance of the marriage ties, which neither the collusion nor the negligence of the parties can impair." *Andrews,* C. J., *Allen* v. *Allen,* (Conn.) 49 L. R. A. 142. According to these decisions, the present law of that state is more nearly expressed in the dissenting opinions in *Nichols* v. *Palmer,* 5 Day 47, than in the prevailing ones.

That a contract simply for separate maintenance is valid may be said to be the general American rule. *Randall* v. *Randall,* 37 Mich. 563 ; *Henderson* v. *Henderson,* 37 Ore. 141,— 48 L. R. A. 766 ; *Emery* v. *Neighbor,* 7 N. J. Law 142 ; *Aspinwall* v. *Aspinwall,* 49 N. J. Eq. 302 ; *Phillips* v. *Meyers,* 82 Ill. 67 ; *Luttrell* v. *Boggs,* 168 Ill. 361 ; *Dutton* v. *Dutton,* 30 Ind. 452 ; *Robertson* v. *Robertson,* 25 Ia. 350 ; *Carey* v. *Mackey,* 82 Me. 516 ; *Roll* v. *Roll,* 51 Minn. 353 ; *Helms* v. *Franciscus,* 2 Bland 544 ; *Squires* v. *Squires,* 53 Vt. 208 ; *Gaines* v. *Poor,* 3 Met. (Ky.) 503 ; *Chapman* v. *Gray,* 8 Ga.

337 ; *McLaren* v. *Bradford*, 52 Ga. 648 ; *Miller* v. *Miller*, 16 Ohio
St. 527 ; *Hutton* v. *Duey*, 3 Pa. St. 100 ; *Goodrich* v. *Bryant*, 5
Sneed 325 ; *Bowers* v. *Hutchinson*, 67 Ark. 15.

In most of the cases where the question has been discussed, the
decisions have been put upon grounds other than that of uphold-
ing an agreement to live separate. In a few cases, courts have
been misled by the fact that an agreement to maintain is valid
into supposing that one to live separate is equally so. Even these
courts agree that if there be a covenant for future separation the
whole deed is void. Yet this has no more tendency to promote a
method of living not approved by law than an agreement to con-
tinue a present separation. The distinction, so far as one exists,
originated from the rule that a mere agreement to maintain a sep-
arated wife was all that was at first recognized. This was put
upon the ground that the husband's agreement was one to do
what was a part of his duty. It was not the fact that the agree-
ment depended upon an existing separation ; but that it neither
depended upon nor induced separation of any kind, either present
or prospective, that made it a valid contract. When there was an
existing separation, conveyancers were skillful enough to so draw
the agreement that it appeared free from objectionable features,
and so it would be upheld ; but when there was only a contempla-
tion of separation, this was not so easily accomplished ; the real
motive and consideration then appeared in the contract, and for
this cause it would be condemned by the court. Hence, it came
to be thought that if the parties had actually separated they
might make a legal contract to continue to live apart.

" Out of these two propositions — namely, that married parties
cannot validly contract to live in separation, yet the husband can
obligate himself to render her a maintenance wherever she resides
— comes the entire doctrine of separation under articles. When
we look at the cases, we find that they are sometimes discordant,
and sometimes the particular decision proceeded on a misappre-
hension of true legal distinctions ; but, on the whole, the law as
adjudicated is plainly so in our country, and it was so in England
until of late, however it may be there now." 1 Bish. Mar. &
Div., *s.* 633.

This doctrine is the only one which can be sustained if it be con-
ceded that the marital *status* is one in which the state has an
interest, and over which it may exercise a control. No interme-
diate rule ever has been or can be justified by any process of rea-
soning. If it be true that the rights involved are only private,
why stop at the right of remarriage, or object to decrees of divorce
by agreement? If it is good law that by their own act husband
and wife may cease to sustain that relation, and may thus become

as strangers, what is the principle that forbids one of them to
remarry? No answer to these questions has been vouchsafed.
The courts which have announced the extreme decisions have thus
far refrained from considering the end to which their logic leads.
In avoidance of these questions and similar ones asked long ago
by Lord *Kenyon*, it is said that public sentiment has changed,
social policy is different, and courts must fashion the law to the
demands of the times. However satisfactory this line of argu-
ment may be in England, it cannot be followed here. " To declare
what the law is, or has been, is a judicial power ; to declare what
the law shall be is legislative. One of the fundamental princi-
ples of all our governments is, that the legislative power shall
be separate from the judicial." *Dash* v. *VanKleeck*, 7 Johns. 477,
498.

The authorities in this state, so far as they have touched upon
the question, follow the common law. In *Pidgin* v. *Cram*, 8 N. H.
350, the husband and wife had separated, and the wife was living
with her father, who had covenanted with the husband to sup-
port her. It was decided that this agreement did not free the
husband from his obligation to support his wife. So long as its
covenants were performed he would not be liable for goods fur-
nished to her, because he was in this way performing his duty.
If, however, she should be driven from her father's house by the
inmates thereof, the husband would be liable to one who there-
after supplied her with necessaries.

Unless she leaves his house against his will he is bound to sup-
port her, and she takes his credit with her. *Rumney* v. *Keyes*, 7
N. H. 571 ; *Allen* v. *Aldrich*, 29 N. H. 63.

*Sayles* v. *Sayles*, 21 N. H. 312, was a suit upon a note given in
consideration of a promise not to contest a libel for divorce. Jus-
tice *Wood* said : " No such agreement, even if executed, can form
a valid consideration for either a verbal or written promise. The
great and principal object of the agreement made between the
parties was to bring about a dissolution of the marriage contract,
and to put an end to the various duties and relations resulting
from it. Any contract having any such purpose, object, and
tendency, cannot be in law sustained, but must be regarded as
being against sound public policy and consequently illegal and
void. The marriage relation is one to be encouraged and main-
tained when formed. Such is the well settled policy of the law ;
and its dissolution or determination is not to be left to depend
upon the caprice of the parties. If determined, it must be done
in accordance with some positive enactment of law, and in due
course of judicial proceedings. The good order and well-being of
society require this." The then recent cases upholding separation

agreements were reviewed; but no opinion of their soundness was expressed, beyond the suggestive statement that "in this state, at least, a separation *a vinculo* can only be effected through a decree of the courts of law." From this it may well be inferred that the court did not consider those cases as in harmony with the law here. Similar views of the nature of the *status* have been expressed in other cases. *Clark* v. *Clark*, 10 N. H. 380; *Cross* v. *Cross*, 58 N. H. 373; *Cross* v. *Grant*, 62 N. H. 675.

So far as the English ideas are outgrowths of the early form of divorce *a mensa et thoro*, they are not applicable here. Limited divorces were never granted in this state. *Parsons* v. *Parsons*, 9 N. H. 309, 317. As early as 1791, absolute divorces were here granted for the causes for which limited divorces were granted under the English practice. Act of Feb. 17, 1791; Laws, *ed*. 1805, *p*. 280.

In no reported case in this state has an agreement to live separate been passed upon favorably. What has been said upon the subject has uniformly been opposed to the validity of such a contract. The theory that marriage is only a civil contract is also disapproved of. "It is an institution of society, having its foundation in civil contract." *Cross* v. *Grant*, 62 N. H. 675, 684. The whole doctrine is summed up by Chief Justice *Doe* in a single sentence: "The marriage contract may be broken by either party, with or without the consent of the other, but it cannot be rescinded or modified by them." *Ferren* v. *Moore*, 59 N. H. 106.

It is not necessary to now consider how far the statutory power of husband and wife to contract as to property matters extends; or whether their agreement to release prospective rights in each other's estates could in any event be enforced. Compare *Shute* v. *Sargent*, 67 N. H. 305, with *Reed* v. *Blaisdell*, 16 N. H. 194, *Cutter* v. *Butler*, 25 N. H. 343, and *Hayes* v. *Seavey*, 69 N. H. 308. Conceding that the right extends to the release of every property interest, present and prospective, it cannot avail this plaintiff.

Modern legislation enlarging the rights of married women as to contracts and torts has not destroyed the marital *status*, as defined by the common law. "There is nothing in the series of statutes by which her rights and privileges have gradually approximated an equality with those of her husband that abrogates the marital rights of trust and confidence incident to the relation in all stages of society. . . . The obligations, the disabilities, and the privileges inherently consequent upon the marriage union, remain unchanged. . . . While unjust disabilities of the wife have been removed, there are implied stipulations of the contract which each party remains justly disabled to violate." *Laton* v. *Balcom*, 64 N. H. 92, 95, 96. "The incidental changes of conjugal rights and duties are

such only as are reasonably and necessarily implied." *Cross* v. *Grant*, 62 N. H. 675, 685. "These statutes have not taken away the right of either party to the marital contract to have the affection, society, and aid of the other." *Ott* v. *Hentall, ante, p.* 231.

An agreement renouncing marital rights is void. An agreement touching property rights may be valid. If covenants of each kind occur in the same agreement, its validity must be determined by the ordinary rules. If the promises are separate, and the consideration is divisible, the legal part of the contract is upheld; but if the consideration is entire, the whole must fail. *Bixby* v. *Moor*, 51 N. H. 402. Applying this test to the agreement in the present case, the result is at once apparent. The husband agreed to separate, on friendly terms, and to make no demand on the wife nor her property after that date. The wife made a similar agreement on her part. The agreement to live separate is not distinct from that as to property. There is no separate promise, upon separate consideration, as to the legal and illegal parts. They are blended together without discrimination. The wording of the writings and the facts surrounding the separation all tend to show that the dissolution of the marriage relation was the object the parties had in view. All other matters were merely incidental to this main purpose.

The agreement was an attempt by a husband and wife to do that which the court could not have done either upon the application of one of the parties or with the consent of both. They were desirous of dissolving the marital relation; and, although no cause for divorce existed, they entered into this agreement whereby each attempted not only to release all the rights then held as against the other, but also to absolve the other from all duties attendant upon the married state. It is not an agreement made up of distinct parts, but a harmonious whole, the main object of which is the dissolution of the marriage tie. It had its inception in the wife's declaration of her intention to leave her husband's house. The agreement as to property is merely incidental, while anything in the nature of a provision for the support of the wife is wholly lacking. It is hardly open to doubt that if they had intended to continue to live as husband and wife they would not have contracted as to property rights. In any event, it does not appear that there would have been such a contract, or that the agreement on that subject is independent of the illegal promise to separate. "Whether the illegality extends to the whole or only a part of the consideration is immaterial. The contract was entire, and in such case the whole is void, if tainted with illegality in any part." *Weeks* v. *Hill*, 38 N. H. 199, 203; *Hinds* v. *Chamberlin*, 6 N. H. 225, 227.

The executor also contends that his first reason for appeal (that the defendant has no interest in the estate) is well founded, because the husband " willingly abandoned his wife and has absented himself from her, or has willfully neglected to support her, . . . for the term of three years next preceding her death." P. S., c. 195, s. 18.   The object of this statute is to deprive a wrongdoer of certain rights which he would otherwise possess.   It applies to a " deserting husband " (*Martin* v. *Swanton*, 65 N. H. 10, 11), and there is no desertion where there is a separation by agreement. *Moores* v. *Moores*, 16 N. J. Eq. 275, 280 ; 1 Bish. Mar., Div. & Sep., s. 1662.   There was here no abandonment and no willful neglect to support, in the sense in which those terms are used in the statute.   There was no denial by the husband of any right which the wife desired to enjoy.   She was not abandoned, but merely permitted to go the way of her own choosing.   She was not willfully neglected, but was left to her own resources at her own request.

It is also contended that the defendant's rights are cut off because in certain cases the wife of a non-resident may convey her property as though sole.   P. S., c. 176, s. 8.   The object of this statute is to allow the wife, in such a case, to manage her property as she chooses.   It looks wholly to transactions during life.   Its objects would not be promoted by a construction which would include a disposition of property by will.   The language used aptly expresses the purpose ; for while in a technical sense a will may be said to be a conveyance, the ordinary rule is that it is not included when that term is used.   *Jenckes* v. *Probate Court*, 2 R. I. 255, 256 ; *May* v. *Slaughter*, 3 A. K. Marsh. 509.

*Appeal dismissed.*

All concurred.